**LEWIS MACH. CO. v. AZTEC LINES, Inc.**

**LEWIS MACH. CO. v. ST. PAUL FIRE & MARINE INS. CO.**

Nos. 9661, 9662.

United States Court of Appeals
Seventh Circuit.
Feb. 23, 1949.

---

1 Affirmed from the Bench without written opinion.

Franklin R. Overmyer, Adelor J. Petit, Jr., Roy E. Olin, Edward B. Hayes, and Petit, Olin & Overmyer, all of Chicago, Ill. (Lord, Bissell & Kadyk, Edward B. Hayes, and Stephen A. Milwid, all of Chicago, Ill., of counsel), for appellant.

W. Russell Arrington and Virgil C. Lutrell, both of Chicago, Ill. (Arrington & Healy, of Chicago, Ill., of counsel), for appellee.

Before KERNER and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

The plaintiff-appellee sued and obtained judgment against the Aztec Lines, Inc., an interstate common carrier by motor, and Anchor Insurance Company and St. Paul Fire and Marine Insurance Company, cargo insurance carriers insuring Aztec's cargoes, for the loss of a valuable piece of machinery shipped by the plaintiff via Aztec from Chicago to Cleveland, Ohio. From this judgment Aztec and St. Paul have filed separate appeals. The case was tried before the District Court without the intervention of a jury.

First, as to the appeal of Aztec. There is no dispute that Aztec received the ma-

chinery in good condition at Chicago for shipment to Cleveland, Ohio, where it arrived of no value as a machine and valuable only as junk. Aztec seeks to avoid its liability on the ground that the damage to the machine was due to the fault of the plaintiff. The bill of lading under which this shipment moved provided:

"Section 1-A: The carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto except as hereinafter provided.

"Paragraph B: No carrier or party in possession of all or any of the property herein described shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, the authority of the law or the act or default of the shipper or owner, or for natural shrinkage."

Aztec does not dispute its liability as a common carrier unless it has shown that the damage to the machine was due to the plaintiff's fault, as provided by Paragraph B above. Part II of the Interstate Commerce Act, 49 U.S.C.A. § 317(a), requires the carrier to file a tariff and a classification which of course become a part of the contract of carriage. The tariff and classification filed by Aztec contained the following provisions:

"Where an article or articles in a single container or shipping form tendered weighs 500 pounds or more, or if the greatest dimension exceeds 8 feet, or greatest and intermediate dimension each exceed 4 feet, loading or unloading shall be performed by the shipper or consignee, as the case may be.

\*    \*    \*    \*    \*    \*

"Skids must be constructed of material of sufficient strength and dimensions to afford safe handling and protection of the shipment, and so constructed as to enable skid and article thereto to be handled as a unit."

It is the contention of Aztec that it was the duty of the plaintiff in loading the machine to see that it was so fastened and secured that in the ordinary course of travel it would not tip over and fall from the truck.

Assuming, without deciding, that this is the law and the proper construction of this contract of carriage, the District Court found that the plaintiff was not at fault in securing and fastening the machine to the truck, and if the loading by the plaintiff was defective, the defects were patent to Aztec through the driver of the truck and the terminal personnel of Aztec in Chicago, who accepted the shipment; and further, that the damage to the machine was really due to the negligence of Aztec.

Since this case was tried by the court without the intervention of a jury, the findings of fact made by the trial court may not be set aside by us unless clearly erroneous. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. If there is any substantial evidence to support these findings, the liability of Aztec is established here. In considering this record, we look only to the evidence most favorable to the District Court's findings and such reasonable inferences as may be drawn from such evidence.

The following facts are clear from the record. The machine weighed about six thousand pounds. A picture and diagram of it are in the record. It was mounted upon skids, and no complaint is made about the skids or the way the machine was mounted thereon. The machine was loaded onto the trailer of Aztec by the plaintiff's agents by the use of a crane which lowered the machine through the top of the trailer, the tarpaulin cover having been rolled back for the loading. The floor of the trailer was made of oak boards two inches thick, and the sides of the trailer were of plywood inside and sheet iron outside and extended upward from the floor about six feet with stakes, to which the sides were fastened, about two feet apart. The rear of the trailer rested upon a single axle, and the front on the fifth wheel of the tractor which is just above the rear wheels of the tractor. The machine was in about the center of the trailer and about equidistant between the sides thereof. The skids, which were parallel to the sides of the trailer, were nailed to the floor of the trailer with spike nails.

After the machine was placed on the trailer, the driver returned to the terminal.

He was then ordered to pick up some cartons of paint which were loaded on some part of the trailer. The trailer was not full. The truck was then driven to Cleveland, and several times on the way it was inspected by the driver and nothing out of the ordinary was noticed or occurred. Another driver made the deliveries in Cleveland. First the paint was delivered, and then the driver drove to his mother's home and parked, headed north, on a street nearby known as 51st Street, near the intersection of Louisa Court. After lunch the driver started the truck and made a sweeping turn west into Louisa Court. The tractor was then moving at a speed of five to seven miles per hour. Just as the trailer was making the turn, the machine toppled over, crashed through the side of the trailer, fell into the street and was destroyed. The driver had made other turns on that trip over the streets of Cleveland and nothing had happened.

It appears from the diagram and picture of the machine that its center of gravity, as the trial court found, was low. The machine itself was very heavy and with the center of gravity low, it would be difficult to upset it. It was nailed to the floor with spike nails which we judicially know to be nails of the largest size. It rode without any mishap or anything to indicate it was not secure all the way from Chicago to Cleveland, during which journey it must have made many turns. It was driven through Cleveland until the trailer was emptied of all its load except this six thousand pound machine, and nothing happened until the driver "swept" the trailer into Louisa Court, when the machine broke loose from its moorings and fell into the street.

■ This evidence is quite substantial and fully supports the court's findings first, that the defendants had not shown the plaintiff to be at fault, and secondly, that Aztec was negligent, which was more than the plaintiff was required to show to establish the liability of Aztec.

■ Liability of the carrier having been established for failure to deliver the machine, what was the measure of damages? The measure of damages was the fair market value of the machine in Cleveland. The Ansaldo San Giorgio I v. Rheinstrom Co., 294 U.S. 494, 496, 55 S.Ct. 483, 79 L.Ed. 1016; St. Johns N. F. Shipping Corp. v. S. A. Companhia Geral, etc., 263 U.S. 119, 125, 44 S.Ct. 30, 68 L.Ed. 201. The District Court found the market value of the machine in Cleveland to be $4,200. The plaintiff produced witnesses who testified to a range of value of the machine from $3,250 to $5,000. The defendants put in no evidence as to value. The District Court found the value within the range of evidence relating thereto, and its finding in this regard was fully warranted and supported by this evidence.

We now consider the appeal of the defendant St. Paul Fire and Marine Insurance Company from so much of the judgment as found it liable to the plaintiff to the extent of $1,000 with interest, which was the amount of the coverage under the policy it had issued in favor of Aztec, which policy was filed with the Bureau of Motor Carriers of the Interstate Commerce Commission. Aztec gave St. Paul notice of the cancellation of this policy, effective May 1, 1947, and secured from Anchor a policy effective the same date covering the same risk and paid the premium thereon, and has not paid to St. Paul, nor has St. Paul sought payment of, any premiums after May 1, 1947. The cancellation of the St. Paul policy was pursuant to the terms thereof. Anchor's policy had also been filed with the Bureau of Motor Carriers.

Under the rules and regulations of the Bureau, a policy may not be cancelled until thirty days' notice shall have been given to the Bureau.[1] The Bureau, under regulations published by the Interstate Commerce Commission pursuant to its statutory authority,[2] does not prescribe a maximum amount of coverage but only a minimum.[3] No notice of the cancellation of St. Paul's policy was given the Bureau as required

---

[1] C.C.H. Federal Carrier Service Par. 3296.

[2] 49 U.S.C.A. § 315.

[3] C.C.H. Federal Carrier Service Pars. 3290A, 3291.

by its regulations. The damage occurred on May 13, 1947. When a policy is filed with the Bureau, in order to protect the public, the shipper and the consignee, the Bureau endorses thereon as a condition to the right to file the policy, without which policy the carrier could not get permission to operate, that the coverage of the policy shall extend to and inure to the benefit of the shipper or consignee, and "that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement by the insured, shall affect in any way the right of any shipper or consignee, or relieve the Company from liability for the payment of any claim for which the insured may be held legally liable to compensate shippers or consignees * * *."

It is the contention of St. Paul that since the policy was cancelled May 1, 1947, in accordance with its terms, and other insurance was effected through Anchor, St. Paul had no liability thereunder on May 13, when Aztec failed in its duty under the contract of carriage.

There is no limitation as to the amount of insurance a carrier can carry. Only a minimum is fixed by the Bureau, and its endorsement upon the policy is obviously for the protection of the shipper and the consignee. Under its terms, "no term of the policy may be read into it, insofar as shippers and consignees are concerned", York-Buffalo Motor Express v. National Fire & Marine Ins. Co., 294 N.Y. 467, 63 N.E.2d 61, 62.

■ Since this policy was cancelled pursuant to the provisions of the policy itself, such cancellation as to the shipper may not become effective until the policy is cancelled of record in accordance with the Bureau's rules and regulations by giving proper notice thereof. The coverage of the St. Paul policy was not terminated. York-Buffalo Motor Express v. National Fire & Marine Ins. Co., supra; Amalgamated Casualty Ins. Co. v. Winslow, D.C. Cir., 135 F.2d 663, 664; Cf. Maryland Casualty Co. v. H. A. Moss & Son, 276 Mich. 219, 267 N.W. 819, 820. If this were not true, the shipper could never ascertain from the public records whether he was covered but would have to examine the records of the carrier and the insurer and determine at his peril whether the insurance company of record was on the risk. To obviate such uncertainty and inconvenience, the Bureau promulgated this reasonable and salutary endorsement which was a part of St. Paul's contract with the shipper. Both the policy of Anchor and that of St. Paul were in effect, and liability attached in favor of the plaintiff shipper under both of them.

■ St. Paul has objected to the allowance by the court of interest as a part of the recovery in the judgment for failure to deliver the machine. When the carrier failed to deliver the machine on May 13, 1947, as was its duty, its liability for damages for such failure then and there arose. Whatever damages the carrier was liable for up to $1,000, St. Paul was liable for. As part of the damages the court allowed interest for failure of the carrier and St. Paul to meet their obligations. This was proper. The rule as applicable to St. Paul is properly stated in 46 C.J.S., Insurance, § 1391, as follows:

"In accordance with general rules governing the recovery of interest as damages in actions for breach of contract * * * where the amount to which plaintiff is entitled under an insurance contract is wrongfully withheld by the insurer after payment is due, interest on such amount may be allowed as damages in an action on the policy * * *."

■ Under the statute of Illinois, interest may be allowed at the rate of five per cent per annum as part of the judgment for damages for the breach of a written instrument. Ch. 74, Sec. 2, Ill.Rev.Stat. (1947). An insurance policy is a written instrument within the meaning of this statute, and interest allowed in accordance therewith as a part of the recovery for a breach of such written instrument is properly allowed. Knickerbocker Ins. Co. v. Gould et al., 80 Ill. 388; Employers' etc., Corp. v. Kelly Const. Co., 195 Ill.App. 620, 635; Ledford v. Hartford Fire Ins. Co., 161 Ill. App. 233, 240.

We find no error in the record, and the judgment is affirmed.