**Marian Erickson, Plaintiff-Appellee, v. Hospital Service Corporation and Illinois Medical Service, Defendants-Appellants.**

Gen. Nos. 49,182, 49,219.

First District, Second Division.

July 3, 1964.

Miller, Gorham, Wescott and Adams, of Chicago (John F. Arnold, of counsel), for appellants.

Tenney, Bentley, Guthrie & Howell, of Chicago (John P. Forester, of counsel), for appellee.

MR. JUSTICE BRYANT delivered the opinion of the court.

This is an appeal from a judgment of $277.30 entered against the defendant, Hospital Service Corporation, on February 18, 1963, in the Municipal Court of Chicago; and from a judgment of $61 entered against the defendant, Illinois Medical Service, on February 18, 1963, in the Municipal Court of Chicago. Claims for interest were denied in each case. The defendants are commonly known as Blue Cross and Blue Shield respectively. Both judgments were in favor of plaintiff, Marian Erickson; and since both judgments arise out of claims associated with the same illness, the cases have been consolidated.

■ We are called upon to determine whether plaintiff received "hospital service" within the meaning of and as defined in her Blue Cross certificate, and, again, whether Miss Erickson received "general medical care" in a hospital as defined by her Blue Shield certificate. The pertinent section of the Blue Cross certificate reads:

"I(o). 'Hospital service' means receiving a member who has been referred by a physician into a Plan hospital only as a *bed patient* in a room containing accommodations for two, but not more than four, bed patients, if available, and providing care for all types of cases, whether acute, chronic or pre-existing conditions, when necessary to and concurrent with service for conditions requiring and receiving *hospital bed care*.

465

It includes *such service* during the basic and supplemental periods, provided the member is under the care and treatment of a physician and as long as the physician declares that such service is necessary . . . " (Emphasis supplied.)

The pertinent section of the Blue Shield certificate reads:

"III(C)(1)   If the medical treatment of a beneficiary shall require, and such beneficiary shall receive, three or more consecutive days of *hospital bed care,* the Plan will pay the attending participating physician the amount of his fee for each visit limited to one visit per day, . . ." (Emphasis supplied.)

Plaintiff, Marian Erickson, suffered from acute rhinitis for which she had been unsuccessfully treated by her physician, Dr. Randolph, for fourteen years. Acute rhinitis is a nasal condition marked by acute congestion of mucous membrane of the nose, dryness, increased mucous secretion, impeded respiration and some pain. On July 9, 1959, Dr. Randolph found the rhinitis condition unchanged and discovered that there was almost complete nasal obstruction, plaintiff only occasionally being able partially to breathe through one side of her nose. Under the direction of Dr. Randolph she was admitted to Swedish Covenant Hospital on August 2, 1959, where she remained until August 19, 1959. Treatment during this period consisted of a five-day fast, during which she was allowed only spring water to drink and salt in moderation, but no foods. Following the fast, she was given one food at a time and observed for evidence of reaction. After being tested with fifteen foods in the order of probability associated with rhinitis, she was given a diet of uncommon foods selected from the market because of their known content of insecticide

residues and other chemical additives and contaminants. As a result of these tests Miss Erickson was advised to avoid foods that are notoriously chemically contaminated by spray residues or phenolic resin lining of tin cans, fumigated foods, and other chemically contaminated foods. Miss Erickson's condition has improved since her hospitalization.

Dr. Randolph believed that hospitalization was required in order to obtain controllable environmental factors. Treatment on an out-patient basis had in the past been largely unsuccessful. It was also required because acute emergencies sometimes arise in the course of fasting, with nausea and vomiting occurring in about ten per cent of the patients and with one-half of these cases requiring intravenous feedings. Other reactions which Dr. Randolph testified were common in testing of this nature were dehydration, tendencies to become stuporous, passing out, asthma, hives, eczema, headache and depressions.

Defendants offered no evidence oral or documentary before the lower court. On appeal they urge that during Miss Erickson's stay in the hospital she received none of the services commonly understood to be components of "bed care." She was able to walk about as she pleased; care for her own personal hygiene; took and recorded her own pulse; and did not receive any medications.

The key to appellants' argument concerns the definition of "hospital service" under the Blue Cross certificate. This in turn depends upon the meaning of "bed patient" and "bed care" as used in the definition. No case has defined these terms. Appellants suggest that the term "confined to bed" has been defined and that we should adopt that definition by implication.

In Lewis v. Liberty Industrial Life Ins. Co., 166 So 143 (La, 1936), a case in which the curatrix of

an insane woman sought to collect disability insurance for a period during which she was confined in a state hospital, the court had occasion to define the term "necessarily confined to bed." In determining that the present disability was outside of that term, the court said at 145:

> "Ruling Case Law, vol 14, p 1318, reads: 'A requirement that the insured be confined to his bed also means that the insured must be substantially bed-ridden.' "
>
> ". . .
>
> "In the instant case the insured has at no time been confined to her bed as a result of her affliction. . . ."

In Interstate Life & Accident Co. v. Spurlock, 16 Tenn App 250, 64 SW2d 75 (1933), where a blind man attempted to recover under a policy providing "by reason of illness necessarily confined to bed," the court in denying liability stated the following at 78:

> "In the policy in the case at bar it is provided that weekly benefits for sickness, where 'the insured has been, by reason of illness, necessarily confined to his bed and there visited professionally by a duly licensed and practicing physician,' shall be paid by the company. Under this provision, three things must concur to enable the insured to recover: (1) Illness, (2) confinement to the bed, and (3) there be visited professionally by a physician. By no stretch of the imagination can it be said that plaintiff was confined to his bed. To come within the policy, he must be confined to his bed the greater part of the time every day during his illness. 6 Cooley's Briefs on Insurance (2d Ed) 5550. . . ."

468

In Washington Nat. Ins. Co. v. Curry, 97 SW2d 525 (Tex Civ App 1936), where a man blinded as a result of an accident sought compensation under a policy with a "confined to bed" clause, the court stated at 526:

". . . The illness disability provision of the policy is conditioned, among other things, that the insured shall be 'under the care of a physician and necessarily confined to bed.' The clause 'confined to bed' in such cases must not be given a literal construction. It is evident, we think, that the clause means that, the disability by reason of illness must reach that extent and be that severe, as ordinarily the party afflicted would be confined to bed. The term 'confined to bed' evidently depicts only the extent of the illness, an evidentiary condition, and should not be literally applied by a court or jury."

The three above cases all interpret one phrase and yet they do not reach substantial accord on its meaning. The cases do agree however: (1) that the facts of the case determine the particular application; (2) that the contract of insurance should not be extended by implication; (3) where two meanings are ascertainable in their "plain, ordinary and popular sense" the policy will be construed in favor of the insured. The cases cited by both parties here, of course, echo these same rules.

The term "hospital bed care" on its face is not as limited as "confined to bed." Appellants would have us hold that there are certain services inherent in the term such as need for nursing aid, inability to handle personal hygiene, inability to walk around, and need for medication. It would be impossible to spell out in a policy the limits of treatment for a particular disability, but the term "bed care" in its literal mean-

469

ing does not necessarily require any of the above things. The whole phrase only implies requiring a hospital bed and being administered to therein. The term confinement as used in the above cases certainly goes further and implies a limitation of activity to the bed while in the hospital. That factor just is not present in the term which we are construing either expressly or by implication.

It is apparent that the intention of the parties to the contract was to leave to the doctor a good deal of discretion in determining when hospital service was necessary and required and what the limits of that service should be. In this case Dr. Randolph unsuccessfully treated the plaintiff for many years. He then placed her in the hospital as a bed patient and treated and observed her intensively with substantially the same procedures which he had used through the years. He testified that this was necessary and he explained why the results which he obtained in the hospital were satisfactory where his previous efforts had failed. Because one doctor cures by medication while another cures by determining allergies should have no effect on the term "bed care" so long as both methods are recognized medical practices and some of the treatments are required to and did occur in bed. The defendant drew the document construed here and it did not seek to limit its liability beyond this point.

We believe that the plaintiff received "bed care" within the clear meaning of the definition of "hospital service" as spelled out in the Blue Cross certificate.

In construing the term "general medical care" under the Blue Shield certificate we run into substantially the same problem with the term "hospital bed care." The above reasoning also applies. The plaintiff was required to be hospitalized by her doctor, she was assigned to a bed within the meaning of the term in the policy and received some of the treat-

ments for which she was hospitalized while in bed and under the direction of her doctor. She has received "hospital bed care" within the terms of the Blue Shield certificate.

■ ■ During the course of the proceedings plaintiff introduced evidence over objection that two other patients in plaintiff's room became nauseous, vomited and were given intravenous feedings during the course of plaintiff's fasting period. Defendants maintain that such evidence was irrelevant and improper because not related to proof of plaintiff's claim under either certificate. We disagree. Plaintiff had to show that Dr. Randolph required her to receive "bed care." Over objection Dr. Randolph testified that acute emergencies often occur in the course of fasting and that this was one reason that Miss Erickson was required to be hospitalized. To bolster this argument plaintiff showed that two women, who, although not suffering from rhinitis, were fasting in a program similar to hers, were nauseous, vomited and required intravenous feedings. This was not at all collateral but was directly related to an essential element of plaintiff's case. If this testimony were offered to show that the plaintiff herself suffered similar reactions or to imply such a thing it would not have been admissible. Sanitary Dist. of Rockford v. Johnson, 343 Ill 11, 174 NE 862 (1931) and Missouri & Illinois Coal Co. v. Reichert, 119 Ill App 148 (1905), cited by defendants, both lay down principles applicable to cases of this latter type.

■ The plaintiff has asked for interest on her judgment in accordance with the terms of the Interest Act (Ill Rev Stats c 74, § 2). It is clear that an insurance policy is a written instrument within the meaning of the interest statute. See Lewis Mach. Co. v. Aztec Lines, 172 F2d 746, 750 (1949). She should receive her interest at the statutory rate unless its running has been otherwise tolled. Plaintiff's ex-

hibit (4) was a copy of a bill paid the hospital by plaintiff on October 7, 1959. Exhibit (5) is a copy of a bill paid to Dr. Randolph on October 8, 1959. Plaintiff should not have been required to pay these bills and she has been deprived of the use of her money for that reason.

The judgment is affirmed in part and reversed in part and cause remanded with directions to enter judgment against the Hospital Service Corporation for $277.30, plus interest thereon at the rate of five (5) per cent per annum from the date of the payment by the plaintiff to the date the judgment is entered, and a judgment of $61.00, plus interest at the rate of five (5) per cent per annum against the Illinois Medical Service from the date paid by the plaintiff to the date the judgment is entered.

Judgment affirmed in part, reversed in part and remanded with directions, on rehearing.

BURKE, P. J. and FRIEND, J., concur.

### On Rehearing

Because of the appellants' urging of the wide-reaching consequences of our decision in this case, we granted their petition for rehearing. We have considered the arguments of the petition for rehearing and the arguments of the brief for the appellee and the reply arguments of the appellants and we have decided to adhere to our opinion.

We have considered the request of the appellee for attorney's fees contained in the brief and are denying it.