[No. C008965. Third Dist. Sept. 30, 1991.]

FIREMAN'S FUND INSURANCE COMPANY, Plaintiff and Appellant, v. ALLSTATE INSURANCE COMPANY et al., Defendants and Respondents.

1156

## COUNSEL

Johnson, Pagliero & Schachter, Robert H. Johnson and Luther R. Lewis for Plaintiff and Appellant.

Edson & Laplante and Richard J. Edson for Defendants and Respondents.

## OPINION

**NICHOLSON, J.**—This appeal involves the Highway Carriers' Act (Pub. Util. Code, § 3501 et seq.)[1] which requires a highway carrier to obtain "adequate protection" against liability for personal injury or death as a prerequisite to the issuance or continuance of an operating permit. (§ 3631.) A carrier must supply the Public Utilities Commission (PUC) with evidence of insurance, bond, or qualification as a self-insurer. (§ 3632.) Section 3634 provides "[t]he policy of insurance or surety bond *shall not be cancelable on less than 30 days' written notice to the commission,* except in the event of cessation of operations as a highway carrier . . . ." (Italics added.) This limitation on cancellation is repeated in PUC General Order 100-K: "Every insurance certificate . . . shall contain a provision that such certificate . . . *shall remain in full force and effect until canceled in the manner provided by*

---

[1]All statutory references are to the Public Utilities Code unless otherwise indicated.

*Section (5) of this General Order.*"[2] (Italics added.) Section (5) of General Order 100-K provides: "A certificate of insurance . . . shall not be cancelable on less than thirty (30) days' written notice to the Public Utilities Commission, such notice to commence to run from the date notice is actually received at the office of the Commission." Similar unambiguous language appears in the standard form PUC endorsement TL-675 attached to all policies insuring vehicles subject to PUC regulation.

Plaintiff Fireman's Fund Insurance Company (Fireman's) appeals from a judgment entered in favor of defendants Allstate Insurance Company (Allstate) and Northbrook Property and Casualty Insurance Company (Northbrook) following a court trial in Fireman's declaratory relief action. Fireman's issued a commercial automobile liability policy to a group of independent truckers. Although the truckers discontinued Fireman's coverage and substituted other insurance at the same policy limits, Fireman's failed to give the required notice of cancellation to the PUC. Thus, we conclude Fireman's policy was in full force and effect on the date of the accident giving rise to damage claims. Allstate and Northbrook are entitled to prejudgment interest. We also conclude the trial court properly found the Allstate and Northbrook policies did not cover the highway carrier as an additional insured. Accordingly, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Lisa DeNoon and her passenger, Stephanie White, were seriously injured on May 29, 1985, when a tractor-trailer rig jumped the center divider on the Yolo Causeway and collided with DeNoon's vehicle. Ultimately, a personal injury action was filed on behalf of the two women against shipper Spring Air Mattress (owner of the trailer), carrier Better Home Deliveries, Leaseway Transportation Corporation (Better Home's parent company), subcarrier Richardson Trucking (owner of the tractor), Timothy Gerk (the truck driver), and various entities involved in construction work being done on the Yolo Causeway at the time of the accident. A coverage dispute developed among three of six insurers involved in the personal injury litigation and resulted in the declaratory relief action now before us on appeal. DeNoon settled for more than $6 million. White settled for $267,500.

Spring Air was absolved of liability in the underlying personal injury action. However, Fireman's and Industrial Indemnity, Spring Air's insurers on the date of the accident, participated in the settlement on behalf of

---

[2]Section 3634 reads in its entirety: "The protection against liability shall be continued in effect during the active life of the permit. The policy of insurance or surety bond shall not be cancelable on less than 30 days' written notice to the commission, except in the event of cessation of operations as a highway carrier as approved by the commission."

Richardson Trucking as an additional insured. The Spring Air policies are not at issue in this appeal.

On the date of the accident, Leaseway and Better Home were insured by a $1 million primary policy issued by Allstate and a $5 million excess policy issued by Northbrook.

Richardson Trucking secured insurance through a program administered by Better Home and Leaseway for truckers who contracted with Better Home. Richardson Trucking was covered by a $1 million primary policy, No. KLA 321 44 96, issued by Fireman's to "Independent Contractors of Better Home Deliveries, Inc.," for two policy periods beginning July 1, 1983, and ending July 1, 1985. Harold Lang, the insurance and risk manager for Leaseway, discontinued Fireman's policy and replaced it with a $1 million primary policy issued by Central National Insurance Company to "Specified Independent Contractors of Leaseway," effective November 1, 1984. Central National defended Richardson Trucking, paid its policy limits, and has not contested coverage.

Although Fireman's filed a certificate of insurance with the PUC on August 27, 1984, shortly after the beginning of the second policy period, certifying its policy, KLA 321 44 96, was effective July 1, 1984, until cancelled, it did not notify the PUC of cancellation. There is no record of Central National filing a certificate of replacement insurance with the PUC. However, the PUC received notice of alternate or replacement insurance coverage for Richardson Trucking issued by the Insurance Company of the State of Pennsylvania, which was not a party to the declaratory relief action giving rise to this appeal.

The following insurers contributed to the DeNoon settlement:
Central National. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$732,500
Fireman's Fund (KLA policy) . . . . . . . . . . . . . . . . . . . . . . . . . . .$250,000
Fireman's Fund (Spring Air policy) . . . . . . . . . . . . . . . . . . . . . .$500,000
Industrial Indemnity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$2,000,000
Allstate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$1,000,000
Northbrook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$2,200,350

Fireman's filed this action seeking a declaration Richardson Trucking had no coverage under its policy, No. KLA 321 44 96, for claims arising from the DeNoon/White personal injury action. Fireman's alleged the policy was terminated on November 1, 1984, and replaced by the Central National policy which became effective on that same date. Allstate and Northbrook filed a cross-complaint alleging Fireman's failure to comply with PUC cancellation requirements resulted in the policy, No. KLA 321 44 96,

remaining in effect to its $1 million limits. The cross-complaint also alleged the Allstate and Northbrook policies never covered Richardson Trucking or its driver, Timothy Gerk. Allstate and Northbrook maintained they were entitled to recover $750,000 from Fireman's.

Fireman's moved for summary judgment and summary adjudication of issues. Allstate and Northbrook filed a similar cross-motion. The trial court denied Fireman's motion in its entirety. It ruled Fireman's policy provided $1 million in coverage to Richardson Trucking on May 29, 1985, as excess above the Central National policy. The court also found Fireman's policy limits would have to be exhausted before the Allstate and Northbrook policies would come into effect.

In its trial brief, Fireman's conceded the trial court had adjudicated the issue of whether Fireman's policy provided any coverage at all, but argued the court was still free to determine the level of coverage since those issues had not been affirmatively adjudicated in Fireman's motion for summary judgment and summary adjudication of issues. Allstate and Northbrook maintained the order on the cross-motions resolved all issues necessary to a final judgment.

The case proceeded to trial. In an 18-page ruling, the trial court found "[t]he provisions of the Public Utilities Code, General Order 100-K and the certificate of insurance itself, provide that the policy and the Certificate of Insurance are not cancelable and remain in full force and effect until the required notice is given to the Public Utilities Commission." In its order the court determined:

"1. The policy of insurance of FIREMAN'S FUND INSURANCE COMPANY, policy No. KLA 321 44 96 was in full force and effect on May 29, 1985.

"2. The policy limits of the FIREMAN'S FUND policy in effect on May 29, 1985 were $1,000,000.

"3. The FIREMAN'S FUND insurance policy was obligated to indemnify Richardson Trucking for any damages that may have been awarded against Richardson Trucking in the action filed by Lisa Renee DeNoon, by and through her Guardians ad Litem, Ray DeNoon and Stephanie White, and its obligation extended to the full policy limits of $1,000,000.

"4. The FIREMAN'S FUND policy provided primary coverage.

"5. The policies of insurance from ALLSTATE INSURANCE COMPANY, policy No. 05009501, and NORTHBROOK PROPERTY AND CASUALTY

INSURANCE COMPANY, policy No. UEL0310283, do not provide coverage to Richardson Trucking for the damages arising out of the May 29, 1985 accident.

"6. ALLSTATE INSURANCE COMPANY AND NORTHBROOK PROPERTY AND CASUALTY INSURANCE COMPANY shall recover $750,000 from FIREMAN'S FUND.

"7. Interest at the statutory rate of 10% per annum on the $750,000 shall commence from February 28, 1989, the date that the case was settled according to stipulation."

Fireman's appeals and contends its policy did not provide coverage on May 29, 1985, and, if it did provide coverage, that coverage was (1) excess to all other coverage available to Richardson Trucking, (2) co-excess with the Northbrook policy, or (3) limited to the minimum PUC requirement. It therefore asserts Richardson Trucking was covered by the Allstate and Northbrook policies. It finally claims the trial court erred in awarding defendants prejudgment interest.

DISCUSSION

I

*Notice of Insurance Cancellation Under Section 3634*

 Our pivotal concern is whether the express language of section 3634 applies where the original insurer fails to give written notice of cancellation, the insured secures replacement insurance, and the PUC receives written notice new insurance has been obtained.[3] In its preamble, the Highway Carriers' Act states "[t]he use of the public highways for the transportation of property for compensation is a business affected with a public interest." (§ 3502.) In the context of this preamble[4] and cases

---

[3]For our purposes, we do not differentiate between the situation in which a replacement insurer files a certificate of insurance with the PUC and the situation here in which Central National is the undisputed replacement insurer, and a second insurer, Insurance Company of the State of Pennsylvania, files a certificate of insurance.

[4]The preamble continues: "It is the purpose of this chapter to preserve for the public the full benefit and use of public highways consistent with the needs of commerce without unnecessary congestion or wear and tear upon such highways; to secure to the people just and reasonable rates for transportation by carriers operating upon such highways; and to secure full and unrestricted flow of traffic by motor carriers over such highways which will adequately meet reasonable public demands by providing for the regulation of rates of all transportation agencies so that adequate and dependable service by all necessary transportation agencies shall be maintained and the full use of the highways preserved to the public. It

interpreting predecessor statutes, a careful reading of section 3634 leads us to conclude the language of section 3634 is mandatory. Fireman's failure to provide the PUC with notice of cancellation resulted in continued, uninterrupted coverage of Richardson Trucking.

■ In *Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220 [178 Cal.Rptr. 343, 636 P.2d 32], the California Supreme Court explained "[t]he Highway Carriers' Act has been interpreted as being designed to protect the public from a broad range of potential problems incidental to the transportation of property. 'The paramount purpose of the regulation of the carriers is the protection of the public against ruinous carrier competition and such possible attendant evils as improperly maintained equipment, *inadequate insurance,* and poor service.' [Citation.] Particular P.U.C. regulations must be read in light of this broad mandate to protect the public." (*Id.* at p. 233, italics added; see also *Boulter* v. *Commercial Standard Ins. Co.* (9th Cir. 1949) 175 F.2d 763.) Insurance and bonding requirements are designed "to protect the public against reckless operation of such vehicles by financially irresponsible owners, and to provide a means of recovery for those injured in their person or property by such operation." (Fns. omitted, 7 Appleman, Insurance Law and Practice (1962) § 4463, p. 510.)

■ Sections 3631 and 3634, and PUC General Order 100-K, further the statutory purpose by enforcing continuous insurance coverage during the active life of the highway carrier's permit. If the highway carrier's insurance is cancelled and not replaced by other insurance, the carrier's permit is immediately suspended. Once the permit has been suspended, the highway carrier may not resume operations on any public highway in California "unless and until such carrier shall have filed an insurance certificate, . . ." (PUC. Gen. Order 100-K, § (12), eff. Jan. 1, 1985.)

The parties direct us to two California cases which bear on section 3634.[5] Although neither case addresses the precise question before us, both enforce the strict language of similar statutes.

is the further purpose of this chapter to eliminate, so far as reasonably possible, the excessive use of highways that has resulted from excessive crosshauling of portland and similar cements which has heretofore pertained, when they are hauled in a motor vehicle or motor vehicles loaded substantially to capacity with such commodity or commodities, since these commodities move in great volume in vehicles that are loaded substantially to the permissible gross weight limits provided by the Vehicle Code."

[5]These cases involve two similar statutes. One statute, the "Highway Carriers' Act" (Stats. 1935, ch. 223 as amended by Stats. 1937, ch. 722, §§ 3, 5, 6, and 7; 2 Deering's Gen. Laws 1937, Act 5129a), regulated highway common carriers engaged in transportation of property over the public highways for compensation (§ 2, p. 2147) and is the predecessor of section 3634 (see prior law annot., Deering's Ann. Pub. Util. Code (1990 ed.) § 3634, p. 201). The other statute, the "City Carriers' Act" (Stats. 1935, ch. 312; 2 Deering's Gen. Laws 1937, Act 5134), regulated carriers operating on city streets. (§ 2, p. 2183.) The cancellation provisions

In *Heuer* v. *Truck Ins. Exch.* (1942) 51 Cal.App.2d 497 [125 P.2d 90], a trucker obtained a liability insurance policy from Truck Insurance Exchange (TIE) on April 6, 1938. The TIE policy was filed with the Railroad Commission on April 9. The City Carriers' Act stated the policy was not cancelable on less than 10 days' written notice to the Railroad Commission. On April 23, TIE notified the trucker and Railroad Commission its policy would be canceled effective April 30, 1938. TIE retained the premium earned through that date. A replacement policy filed with the Railroad Commission on April 26 was found void and unenforceable due to misrepresentation by the insured. The Court of Appeal affirmed the trial court finding the TIE policy was in effect on April 25, 1938, the date of the fatal automobile accident which gave rise to the coverage dispute. (*Id.* at pp. 498-500, 502.)

*Heuer* may be distinguished from the case before us. First, the effective date of TIE's cancellation was five days after the date of the accident. TIE retained the premiums through the cancellation date. Second, the replacement policy was void. Failure to enforce TIE coverage would have left the insured unprotected and the victim uncompensated. Third, the replacement policy was not filed with the Railroad Commission until the day after the accident.

In *Ohran* v. *National Automobile Ins. Co.* (1947) 82 Cal.App.2d 636 [187 P.2d 66], a trucker obtained a liability insurance policy from National Automobile in late February 1943. Shortly thereafter, he acquired an additional truck. On learning American Casualty Company had lower insurance rates for the two trucks, the trucker returned the National Automobile policy to the general agent and ordered a policy from American Casualty on March 15, 1943. On March 16, the general agent sent the Railroad Commission a cancellation notice effective March 26. The trucker paid the National Automobile premium through that date. On March 22, 1943, one of his trucks was involved in an accident giving rise to personal injury claims. The American Casualty certificate of insurance was filed with the Railroad Commission the following day. (*Id.* at pp. 638-639.) The trial court found the parties effectively canceled the National Automobile policy as of March 15. The Court of Appeal reversed, concluding the parties could not terminate the insurance contract by mutual agreement. "[T]he Legislature enacted section 7 of the Highway Carriers' Act with full contemplation of the practice and use of cancellation clauses generally as between insurer and insured and that it intended therein to *limit this right of cancellation according to the strict terms*

---

were identical. (2 Deering's Gen. Laws 1937, Act 5129a, § 7; 2 Deering's Gen. Laws 1937, Act 5134, § 6.)

*of the statute, making such notice indispensable for an effective termination both as to the parties and to the public.*" (*Id.* at p. 643, italics added.)

Unlike the facts now before us, in *Ohran* the Railroad Commission was not notified of the alternate or replacement insurance prior to the accident. Furthermore, both the insurer and the insured intended National Automobile provide coverage on the date of the accident. National Automobile asked the trucker to pay the premium through March 26, 1943, and the trucker did so. The *Ohran* court acknowledged cases from other jurisdictions which recognized the power of an insured to waive the notice requirement when other valid insurance had been substituted. However, the court stated "the substitution rule" would not apply to the facts of *Ohran*, even if it were accepted in this jurisdiction. (82 Cal.App.3d at p. 645.)

*Heuer* and *Ohran* do not elaborate on the rationale for their strict application of these predecessor statutes. Other jurisdictions are virtually uniform in their strict enforcement of cancellation clauses in statutory schemes of compulsory insurance.[6] We looked to those jurisdictions for reasons they used to justify strict construction of cancellation provisions.

Courts in two jurisdictions emphasized the need for strict compliance with cancellation requirements to insure the smooth functioning of the statutory scheme regulating highway carriers and vehicles for hire. In *Lewis Mach. Co. v. Aztec Lines, supra,* 172 F.2d 746, the insured canceled one policy and secured replacement insurance, effective on the date of cancellation. The court held the original policy was not terminated because the policy was not canceled in accordance with the notice rules established by the Bureau of Motor Carriers of the Interstate Commerce Commission. (*Id.* at p. 750.) As the court explained, without enforcement of these rules "the shipper could

---

[6]In California, common carrier insurance is compulsory in nature because the PUC requires carriers to obtain coverage as a prerequisite to the issuance or continuance of an operating permit. (§ 3631.) There are similar highway carrier, workers' compensation and financial responsibility laws in Florida, Illinois, Maine, Maryland, Michigan, New York, Pennsylvania, South Carolina and Texas. (See *Midstate Hauling Co.* v. *Reliable Insurance Co.* (5th Cir. 1971) 437 F.2d 616 (Florida law on common carriers); *Lewis Mach. Co.* v. *Aztec Lines* (7th Cir. 1949) 172 F.2d 746 (common carrier under former Interstate Commerce Act); *Eurich* v. *General Casualty & Surety Co.* (1927) 152 Md. 209 [136 A. 546] (workers' compensation); *Zielke* v. *A.J. Marshall Co.* (1943) 306 Mich. 474 [11 N.W.2d 209] (workers' compensation); *Gratopp* v. *Carde Stamping & Tool Co.* (1921) 216 Mich. 355 [185 N.W. 675] (workers' compensation); *Govern. Emp. Ins.* v. *Concord Gen. Mut. Ins.* (Me. 1983) 458 A.2d 1205 (financial responsibility law); *Otterbein* v. *Babor & Comeau Co.* (1936) 272 N.Y. 149 [5 N.E.2d 71] (workers' compensation); *Nassau Ins. Co.* v. *Samuels* (1981) 80 A.D.2d 855 [436 N.Y.S.2d 762] (vehicle for hire); *Vrabel* v. *Scholler* (1953) 372 Pa. 578 [94 A.2d 748] (financial responsibility law); *National Service Fire Insurance Company* v. *Jordan* (1972) 258 S.C. 56 [187 S.E.2d 230] (compulsory motor vehicle insurance); and *Automobile Insurance Co.* v. *Southern Transp. Co.* (Tex.Civ.App. 1937) 101 S.W.2d 585 (common motor carrier).)

never ascertain from the public records whether he was covered but would have to examine the records of the carrier and the insurer and determine at his peril whether the insurance company of record was on the risk." (*Ibid.*) *Nassau Ins. Co. v. Samuels, supra,* 436 N.Y.S.2d 762, took a similar approach. "The purpose of the statute was primarily to protect the passengers of the vehicle, not the owner of the vehicle." (*Id.* at p. 763.) The court noted the Commissioner of Motor Vehicles could not exercise its statutory mandate to revoke the insured's registration for protection of the public, unless it received notice the policy had been canceled. (*Id.* at p. 764.) Although we have not been informed of the specific manner in which sections 3631 and 3634 and General Order 100-K are implemented by the PUC, our reading of the statute and regulations compels the conclusion notice of cancellation is needed for effective regulation of highway carriers—whether to guarantee the public records contain accurate, reliable, and up-to-date information on the carrier's insurance or bond, or to enable the PUC to suspend operating permits for carriers that are uninsured.

Other cases also emphasize the need for efficient administration of compulsory insurance systems. In *Midstate Hauling Co. v. Reliable Insurance Co., supra,* 437 F.2d 616, the court read notice provisions strictly where, as here, the carrier was covered by replacement insurance. The court rejected an insurer's contention the public purposes of the statute were satisfied, other insurance was in effect on the date of the accident, and the 30-day notice provision should not apply. The court declared: "[T]he State has asserted a public interest in the insurance policies of common carriers, and has determined by statute and legislatively authorized Commission rules how that interest shall be protected. To give effect to the cancellation here would erode the public policy contained in the statute and would create a hiatus in the orderly administration of the Commission's affairs." (*Id.* at p. 618.) *Vrabel v. Scholler, supra,* 94 A.2d 748, involved a financial responsibility statute. The Supreme Court of Pennsylvania rejected a lower court ruling which relieved the original insurer from liability on grounds the public interest was protected by replacement insurance obtained on the date of cancellation. The court concluded, "The question, however, is not one of equity but of law as to the meaning and effect of the . . . statutory provision. To treat the Penn Mutual policy as an escape for Colonial from its liability under its extant policy would be to gratuitously inject collateral issues, and, hence, confusion, into a question of compliance with *the statute's clear and unequivocal intendment.*" (*Id.* at p. 750, italics added.) We believe this reasoning is equally applicable to section 3634 and PUC General Order 100-K.

Other jurisdictions which enforce strict compliance with notice provisions in statutory schemes of compulsory insurance place the burden on insurers to

comply with cancellation requirements. (See *Govern. Emp. Ins.* v. *Concord Gen. Mut. Ins., supra*, 458 A.2d at p. 1209; *National Service Fire Insurance Company* v. *Jordan, supra*, 187 S.E.2d at p. 232; and *Zielke* v. *A. J. Marshall Co., supra*, 11 N.W.2d at p. 210.) There are similar sound reasons for doing so here. For example, continuing coverage until the PUC receives notice of cancellation may deter lax practices in the insurance industry. Fireman's exposure, despite the lapse of six months between cancellation and the DeNoon/White accident, may seem unjust. However, the relevant legal and regulatory scheme has been on the books for decades. Fireman's could have easily eliminated its exposure by simply filing the appropriate notice with the PUC. This is a minimal burden—one that is required to maintain the trustworthiness and vitality of statutes and regulations enacted to protect the public interest.

## II

### *Liability for Full Policy Limits*

In deciding Fireman's is obligated to provide coverage for Richardson Trucking, we reject the argument the insurer is responsible for less than the full policy limits of $1 million. Although Fireman's suggestion it is obligated, if at all, for only the minimum amount of coverage required by the PUC has some superficial appeal, that suggestion would reward careless insurers who fail to comply with important and long-established statutory and regulatory requirements. There is nothing in the language of section 3634 or PUC General Order 100-K to suggest the Legislature intended an insurer's contractual obligation to revert to the minimum PUC requirements[7] in these circumstances.

Relying on *Employers Ins. of Wausau* v. *Ohio Casualty Co.* (1983) 146 Cal.App.3d 871 [194 Cal.Rptr. 535], Fireman's contends its policy should be deemed excess to all other insurance covering the accident.

In *Wausau*, a passenger vehicle collided with a tractor which was pulling two trailers. The tractor was owned by Martinez and the trailers were owned by Williams.

Williams was insured by Ohio Casualty Company. Martinez was insured by Employers Insurance of Wausau. The tractor involved in the accident was not listed in the Wausau policy. However, the Wausau policy contained a

---

[7]The requirements, set forth in the standard PUC endorsement and in PUC General Order 100-K, are stated in the alternative: $250,000 per person/$500,000 aggregate for bodily injury liability, or $600,000 combined single limit.

PUC endorsement whereby Wausau agreed to pay any final judgment rendered against the insured resulting from the operation, maintenance, or use of motor vehicles for which a certificate of public convenience and necessity or permit was required or had been issued by the PUC. The tractor was therefore insured as a consequence of the PUC endorsement. That endorsement also crucially provided in relevant part that " 'the insured agrees to reimburse the Company . . . for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.' " (146 Cal.App.3d at p. 873.) Relying on *Pacific Indem. Co.* v. *Transport Indem. Co.* (1978) 81 Cal.App.3d 649 [146 Cal.Rptr. 648], the *Wausau* court concluded the Wausau policy covering the tractor would be deemed excess to the coverage afforded by the Ohio policy. (146 Cal.App.3d at pp. 877-878.)

In *Pacific Indem. Co.* v. *Transport Indem. Co., supra,* 81 Cal.App.3d 649, the driver of a lumber truck was injured when lumber that was being unloaded from his truck fell on him. Two policies of insurance, one supplied by Pacific Indemnity Company and the other by Transport Indemnity Company, ostensibly provided coverage. The Pacific policy provided coverage in the amount of $250,000. Transport's policy limit was $10,000; however, the policy also contained a PUC endorsement which increased the limit to $100,000. Plaintiff settled his claim for $90,000, and Pacific sought recovery of the amount paid in settlement. Both the Pacific policy and the Transport policy contained language purporting to make each policy an excess policy to all other insurance.

The Court of Appeal held that the amount of the settlement had to be prorated between the two insurers. For that purpose, the policy limit of the Transport policy was found to be $10,000, not the $100,000 provided by the PUC endorsement. (81 Cal.App.3d at pp. 658-659.) Crucial to the court's determination was its finding that the PUC endorsement, appended to the Transport policy, provided, " '*the insured agrees to reimburse the Company . . . for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.*' (Italics added.)" (*Id.* at p. 658.)

The instant case is distinguishable from *Pacific Indem. Co.* because Fireman's has not asserted nor identified in the record that its policy was subject to the crucial endorsement at issue in *Pacific Indem. Co.* and *Wausau* which obligated the insured to reimburse the company for any payments made by Fireman's. In the absence of that crucial language, we see no reason to depart from the command of PUC General Order 100-K that every insurance certificate "shall remain *in full force and effect* until cancelled" in the

specified manner.[8] (Italics added.) We therefore conclude Fireman's policy provided primary, not excess coverage.

### III

#### *The Allstate and Northbrook Policies*

 Fireman's also challenges the trial court's determination the Allstate and Northbrook policies issued to Better Home and Leaseway did not provide coverage to Richardson Trucking for damages arising from the DeNoon/White accident. It contends Richardson Trucking's tractor rig was a "hired" vehicle under the Allstate and Northbrook policies due to the sub-haul relationship between Richardson Trucking and Better Home. The trial court found Richardson Trucking's tractor rig a "hired vehicle" within the meaning of the Allstate policy because it was being used for the purpose of fulfilling Better Homes's contractual obligations. However, the trial court declared, "to deem Richardson Trucking to be using its own vehicle with Leaseway/Better Home's *permission* would strain the plain meaning of the words and be contrary to the construction given similar terms in the authorities cited." (Italics added.) We agree and conclude the policy language and intent of the parties demonstrate Richardson Trucking was not an additional insured under the Allstate and Northbrook policies. Fireman's contention it provided excess or co-excess coverage with Allstate and Northbrook is therefore moot.

The parties agree the Allstate policy defines coverage provided by the $5 million excess policy issued by Northbrook. Endorsement 3 of the Northbrook policy provides Northbrook coverage is "at least as broad" as the coverage provided by the $1 million primary policy issued by Allstate. Because "[a]n insurance policy is, fundamentally, a contract between the insurer and the insured. . . ." (*Stein* v. *International Ins. Co.* (1990) 217 Cal.App.3d 609, 613 [266 Cal.Rptr. 72]), we must first examine the language of the Allstate policy to determine the obligations the parties have assumed.

 " 'The interpretation of an insurance policy, like any other contract, is a matter of law as to which a reviewing court must make its own independent determination. [Citations.]' (*State Farm Fire & Casualty Co.* v. *Lewis* (1987) 191 Cal.App.3d 960, 963 [].)

 " 'As a general rule, ambiguities and uncertainties in a policy of insurance are resolved in favor of the insured. (*Gray* v. *Zurich Insurance Co.*

---

[8]See, *ante*, page 1157.

(1966) 65 Cal.2d 263, 269 [].) An insurance policy is not rendered ambiguous or uncertain, however, because of a strained or grammatically incorrect reading of the policy's terms. (*Atlas Assurance Co. v. McCombs Corp.* (1983) 146 Cal.App.3d 135, 144 [].) "Although we construe all provisions, conditions, or exceptions that tend to limit liability strictly against the insurer [citation], strict construction does not mean strained construction. [Citations.] We may not, under the guise of strict construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which it has not been paid." (*Safeco Ins. Co. v. Gilstrap* (1983) 141 Cal.App.3d 524, 532-533 [].) The words used in a policy of insurance are to be construed according to the plain meaning a layman would ordinarily attach to them, and the policy is to be construed as a whole, each clause helping to interpret the other. (*McBride v. Farmers Ins. Group* (1982) 130 Cal.App.3d 258, 260-261 [].)' (*Ray v. Farmers Insurance Exchange* (1988) 200 Cal.App.3d 1411, 1416 []; see *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 912 [].)

"In short, an insurance contract is to be construed in a manner which gives meaning to all its provisions in a natural, reasonable, and practical manner, having reference to the risk and subject matter and to the purposes of the entire contract. (*Barrett v. Farmers Ins. Group* (1985) 174 Cal.App.3d 747, 750-751 [].)" (*State Farm Mut. Auto. Ins. Co. v. Crane* (1990) 217 Cal.App.3d 1127, 1132 [266 Cal.Rptr. 422].)

The Allstate policy must also be considered in light of the expectations of Leaseway, Better Home, and Allstate as to the extent of coverage. "[T]he intent and meaning of the parties is far more important than the strict literal sense of the words used in the contract. For that reason it is equally important to consider the subject matter of insurance and the purpose or object which the parties had in view at that time. *It is also proper to consider the business of the parties, the circumstances surrounding the making of a contract, the situation of the property,* and all other conditions which have a legitimate bearing upon the intention of the parties." (*Dart Transportation Service v. Mack Trucks, Inc.* (1970) 9 Cal.App.3d 837, 847 [88 Cal.Rptr. 670], italics added.)

Here, Leaseway's insurance and risk manager said he had many discussions with people at Leaseway and Allstate about the effect the Allstate policy would have on subhaulers. Leaseway's insurance premium was based on actual losses with retroactive premiums charged if money had to be paid to claimants such as DeNoon. Thus, it was never Leaseway's intent to cover subhaulers, such as Richardson Trucking, which provided their own insurance. Dennis Richardson, owner of Richardson Trucking, knew he carried the $1 million in liability insurance required by his contract

with Better Home, but was unaware he was covered by any other insurance policies at the time of the accident.

The language of the Allstate policy is consistent with Leaseway's intent to exclude Richardson from coverage. Under "WHO IS INSURED," the truckers's endorsement reads:

"1. *You* are an *insured* for any covered *auto*.

"2. Anyone else is *insured* while using with *your* permission a covered *auto you* own, hire or borrow except:

"a. The owner of a covered *private passenger type auto you* hire or borrow from one of *your* employees or agents or a member of his or her household;

"b. Someone using a covered *auto* while he or she is working in a business of selling, servicing, repairing or parking *autos* unless that business is *yours*.

"c. Anyone other than *your* employees, a lessee or borrower or any of their employees, while moving property to or from a covered *auto*.

"3. The owner or anyone else from whom *you* hire or borrow a covered *auto* which is a *trailer* is an *insured* while the *trailer* is connected to another covered *auto* which is a power unit, or, if not connected:

"a. Is being used exclusively in *your* business as a *trucker*, and

"b. Is being used pursuant to operating rights granted to *you* by a public authority.

"4. The owner or anyone else from whom *you* hire or borrow a covered *auto* which is not a *trailer* is an *insured* while the covered *auto*:

"a. Is being used exclusively in *your* business as a *trucker*, and

"b. Is being used pursuant to operating rights granted to *you* by a public authority." (Italics in original.)

Fireman's Fund focuses on paragraph two of "WHO IS INSURED" and cites three cases in support of its contention Richardson Trucking's tractor rig was a "hired" vehicle as a matter of law. (*Monolith Portland Cement Co.* v. *American Home Assur. Co.* (1969) 273 Cal.App.2d 115 [78 Cal.Rptr. 113];

*Fratis* v. *Fireman's Fund American Ins. Companies* (1976) 56 Cal.App.3d 339 [128 Cal.Rptr. 391]; *Travelers Indemnity Co.* v. *Swearinger* (1985) 169 Cal.App.3d 779 [214 Cal.Rptr. 383].)

In *Monolith, supra,* a declaratory relief action was filed to determine the respective liabilities of a cement company's insurer and a trucking company's insurer for defense costs and a personal injury judgment against the cement company. Monolith, a quarrier and processor of cement, contracted with a trucking company to transport cement to a customer. The driver of the truck, an employee of the trucking company, was injured during the loading process. The court held Monolith's insurer obligated for a prorated amount of coverage as a "hired automobile." It found the truck was used under a contract in behalf of the named insured or was a loaned vehicle for purposes of this particular cement shipment. (273 Cal.App.2d at pp. 120, 121-122.)

In *Fratis, supra,* 56 Cal.App.3d 339, this court held an automobile owned by an independent contractor and used by him to solicit subscriptions for a newspaper in return for a mileage allowance was a "hired automobile" within the meaning of the newspaper's liability policy. The policy defined a hired automobile as one " 'used under contract in behalf of . . . the named insured provided such automobile is not owned by or registered in the name of . . . an employee or agent of the named insured who was granted an operating allowance of any sort for the use of such automobile.' " (*Id.* at p. 342.)

*Travelers, supra,* 169 Cal.App.3d 779, another of our decisions, deals with the meaning of "hired automobile" and involves policy language identical to the language found in paragraph two of the Allstate policy here. (See *ante,* pp. 1168-1169.) Travelers insured a school district which hosted a basketball tournament. Swearinger, a student from another district, was lodged with a family of a district student. The host family understood it was to provide transportation to and from school. Swearinger was injured while riding as a passenger in a car driven by a district student and owned by that student's parents. Travelers contested its obligation to cover the host family. The court found the school district "borrowed" the host family vehicle. It then equated the terms "borrow" and "hire" as used in insurance policies.

We agree with the trial court's reading of the cases and the record. Neither *Monolith, Fratis,* nor *Travelers* involved a carrier which routinely contracted with truckers for the transport of goods. There is no indication in *Monolith* or *Fratis* the agreements required the trucking company or independent contractor to carry liability insurance at a specified level. Nor is there evidence the cement company, newspaper, or school district ever considered the

question of whether coverage extended to the vehicle owners or drivers later involved in the coverage dispute. Here, Leaseway intended to exclude subhaulers from coverage. We may not infer the insureds granted Richardson Trucking permissive use of its own fully insured vehicle.

This view of the policy is reinforced by an examination of paragraphs 3 and 4, quoted above. These paragraphs speak to hirings from the owner of a covered auto. They discuss coverage for the owner or anyone else from whom the carrier hires or borrows trailers (par. 3) or autos that are not trailers (par. 4). Paragraph 4 speaks precisely to the situation where a carrier hires a covered auto, which is not a trailer, from the owner. In our view, this provision, not paragraph 2, reasonably applies to the present situation since, as has been said, we would not expect the carrier to grant permission to the owner to use the owner's own covered auto.

Under paragraph 4, the owner of the vehicle, Fireman's argues, is covered by Better Home and Leaseway's Allstate policy (Richardson) as an insured only "while the covered auto: [¶] a. Is being used exclusively in your business as a trucker, and [¶] b. Is being used pursuant to operating rights granted to you by a public authority." Richardson fulfills neither of these conditions. The trial court had before it evidence that Richardson was free to use the tractor for any other business. Moreover, Richardson was operating under its own PUC permit, not that of Better Home or Leaseway. For these reasons, we affirm the trial court's finding Richardson Trucking was not an additional insured under the Allstate and Northbrook policies.

IV

*Prejudgment Interest*

 Fireman's asserts the trial court erred in requiring it to pay Allstate and Northbrook prejudgment interest on $750,000 from February 28, 1989, the date of the DeNoon settlement. We conclude the interest award was proper.

 Civil Code section 3287 reads in part: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, . . ." In other words, prejudgment interest is awarded only when the sum is liquidated within the meaning of the statute. (*Coleman Engineering Co.* v. *North American Aviation, Inc.* (1966) 65 Cal.2d 396, 407 [55 Cal.Rptr. 1, 420 P.2d 713].)

"Damages are deemed certain or capable of being made certain within the provisions of subdivision (a) of section 3287 where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage." (*Esgro Central, Inc.* v. *General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1060 [98 Cal.Rptr. 153]; *Clark Equipment Co.* v. *Mastelotto, Inc.* (1978) 87 Cal.App.3d 88, 98 [150 Cal.Rptr. 797].) The statute does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, "depends upon a judicial determination based upon conflicting evidence and is not ascertainable from truthful data supplied by the claimant to his debtor." (*Esgro, supra,* at p. 1062; see also *Superior Motels, Inc.* v. *Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1073 [241 Cal.Rptr. 487].)

*Esgro* involved alleged breach of insurance contracts insuring stores damaged during the 1965 Watts riot in Los Angeles. The appellate court concluded prejudgment interest was proper on damages awarded under a fire insurance policy because the essential dispute was one of coverage—whether the losses were the result of the fire or looting—and not computation of the amount of loss, if any loss was, in fact, covered. There was little dispute on the value of the property which had been destroyed. (20 Cal.App.3d at p. 1061.) However, the court said the trial court properly denied prejudgment interest on the judgment entered on a policy of business interruption insurance. The sole issue in that cause of action was the extent of the property owners' damage for losses admittedly covered, a judicial determination to be made from conflicting evidence. (*Id.* at pp. 1062-1063; see also *Lineman* v. *Schmid* (1948) 32 Cal.2d 204 [195 P.2d 408, 4 A.L.R.2d 1380] (no prejudgment interest where damages dependent on value of flour for which there was no readily ascertainable market price); and *Block* v. *Laboratory Procedures, Inc.* (1970) 8 Cal.App.3d 1042 [87 Cal.Rptr. 778] (no prejudgment interest in suit for breach of stock option where no established marked for closely held stock).)

■ " ' "[T]he certainty requirement of [Civil Code] section 3287, subdivision (a) has been reduced to two tests: (1) whether the debtor knows the amount owed or (2) whether the debtor would be able to compute the damages." [Citation.]' " (*Hartford Accident & Indemnity Co.* v. *Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285, 1307 [260 Cal.Rptr. 190], quoting *Polster, Inc.* v. *Swing* (1985) 164 Cal.App.3d 427, 434-435 [210 Cal.Rptr. 567].)

Here, the principal dispute was one of liability—whether Fireman's was obliged to cover Richardson Trucking for claims arising from the DeNoon/White accident. As we explained, liability was based on the clear language of section 3634 and PUC General order 100-K. The language of PUC

General Order 100-K also established Fireman's policy was "in *full* force and effect until canceled." (Italics added.) Once liability was established, the *extent* of that liability was no longer a question. Fireman's policy limits were $1 million and it paid $250,000 toward the settlement. The court properly awarded prejudgment interest on the remaining $750,000.

Whatever uncertainty about the *extent* of Fireman's liability may have been fostered by the alternative theories Fireman's proposed, we do not view that uncertainty as an impediment to the award of prejudgment interest. While Fireman's proposed a general formula based on four inapt theories of lesser liability, it also suggested a specific amount due Allstate and Northbrook under each theory. Through it all, the extent of Fireman's exposure remained purely a question of law. Thus, the amounts proposed under Fireman's theories or the amounts legally compelled by section 3634 were readily ascertainable. (*Hartford Accident & Indemnity Co.* v. *Sequoia Ins. Co.,* *supra,* 211 Cal.App.3d at p. 1307.) By pursuit of its various suggested alternatives, Fireman's could neither confuse the magnitude of its obligation nor alter applicable law.

DISPOSITION

The judgment is affirmed.

Carr Acting P. J. and Sims, J., concurred.